# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SUPERIOR ENERGY SERVICES, LLC, | No. 88267-8-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | |
| Appellant. | |

BIRK, J. — Superior Energy Services LLC seeks review of a Board of Tax Appeals (Board) decision that it owed use tax or deferred sales tax, penalties, and interest for goods and services it used in constructing an oil containment system. Superior contracted with Shell Offshore Inc. to design, manufacture, and operate an Arctic Containment System (containment system), and to modify and operate a surface support vessel for Shell's Arctic drilling program. Superior argues its use of goods and services are tax exempt for either of two reasons: (1) the use was pursuant to a lease for a new article of tangible personal property, or (2) the use was to modify the vessel which was a watercraft primarily used for transport of property or people in interstate commerce. Because Superior provided operators for the containment system, and because the vessel was not used primarily to transport property or people in interstate commerce, Superior does not qualify for

either use tax exemption. We affirm the Board's decision and reverse the superior court's decision.

I

In 2010, while the Deepwater Horizon oil spill was ongoing, Shell was exploring options to drill for oil in the Arctic Ocean in the Beaufort and Chukchi seas. As a precondition to drilling in the Arctic, federal regulators required that Shell have a containment system in place for an oil well blowout.[1] In December 2011, Shell contracted with Superior, an oil and gas service business, to create the containment system. The containment system would include a floating barge, high pressured hoses, and a containment dome, and would serve as a "last line of defense" to a "serious loss of well control incident."

Under the contract, Superior would "manage, design, fabricate, procure, assemble, test, demonstrate, maintain, and operate an arctic subsea spill containment system" that would "[meet] the design and performance requirements specified." Superior's scope of work included among other things "[r]ecruiting and training operations staff," "[m]aintaining the system ready for response in the Beaufort or Chukchi Sea during the drilling season," and "[o]perating the system should it be required in an emergency." Superior's scope further included, "[i]n the event of a subsea well incident," that it "call up" its personnel, "move to the wellsite, and deploy equipment under the direction of" Shell. As part of the "[o]perational [r]eadiness" requirements, the contract contemplated that operations staff would

---

[1] Unchallenged findings of fact made by the Board are accepted as true on appeal. Stuewe v. Dep't of Revenue, 98 Wn. App. 947, 950, 991 P.2d 634 (2000) (citing Tapper v. Emp't Sec. Dep't, 122 Wn.2d 397, 407, 858 P.2d 494 (1993)).

be "involved during the design, procurement, and construction and commissioning" of the system.

Superior and Shell agreed that Superior would lease the flat decked ice-class barge *Arctic Challenger* (the vessel) to serve as the base for the containment system. Superior entered into a lease under which it had "full custody" and "complete control in every respect" over the vessel, including sole responsibility for navigation, operation, supply, refuel, and repair. Superior took possession of the vessel in early 2012, moved it from Oregon to Bellingham, Washington, in April 2012, and then, along with its subcontractors, began work on the containment system. Shell spent over $89 million to modify and outfit the vessel.

The containment system was designed to capture oil and gas from a well blowout by placing a dome over the sea floor and then using hoses to transfer the oil and gas to the surface. Superior conducted three deployment tests of the containment system in 2012-13. The first test was unsuccessful, but the subsequent tests were successful. Shell accepted the containment system in April 2013, which began a five year lease between Superior and Shell. Shell paid over $86 million for construction and outfitting of the containment system.

Shell did not drill in 2013 or 2014. In 2013-14, Shell paid Superior over $64 million in "non-drilling rate" fees. As part of its preparation, Superior had the vessel inspected and certified by the United States Coast Guard. The Coast Guard labeled the vessel as an "Industrial Vessel." Shell decided to drill in the Arctic in 2015. Superior prepared the containment system and vessel for the drilling season.

3

A Superior contractor towed the vessel from Bellingham to Dutch Harbor, Alaska, and then to Kotzebue, Alaska. Under Shell's drilling permit, the containment system needed to be on standby near its drilling activities. While it was moored at Kotzebue, no one lived on the vessel, but Superior employees and contractors visited it daily to ensure that the containment system was functioning properly. Superior also maintained a crew of employees and contractors who were ready to fly to Alaska to operate the containment system in the event of an oil well blowout. In 2015, no such blowout occurred.

Shell paid Superior more than $32 million in standby and maintenance fees during the 2015 drilling season. After the 2015 drilling season concluded, the vessel and containment system were towed to Vancouver, British Columbia, Canada. After the vessel arrived in Vancouver, Shell announced that it was abandoning its Arctic drilling program. Shell terminated its contract with Superior and paid a demobilization fee of $2,875,000.00 and a contract termination fee of almost $25 million. Rather than restore the vessel to its original state under the terms of its lease, Superior bought the vessel from its lessor for $5,500,000.00 and then sold it to an unrelated third party for $1,250,000.00.

In 2016, the Department audited Superior for the period of January 1, 2012, through December 31, 2015. The Department assessed Superior over $15 million in unpaid use tax or deferred sales tax and over $6 million in penalties and interest, totaling $21,690,525.00. Superior protested the assessment and sought its reversal within the Department, but the Department upheld its assessment, adding another $503,808.85 in extension interest.

4

Superior petitioned for and was denied reconsideration by the Department. Superior appealed the Department's decision to the Board, arguing that it was exempt from the taxes because its contract with Shell was a tax exempt lease and separately because the vessel was a tax exempt watercraft primarily used for transport of property in interstate commerce. The Board affirmed the Department's assessment. Superior appealed to the superior court, which reversed the Board's decision, finding both of Superior's arguments for tax exemption persuasive. The Department timely appealed the superior court's order.

II

We review the Board's decisions under the Administrative Procedure Act (APA). RCW 34.05.510, RCW 82.03.180; Envolve Pharmacy Sols., Inc. v. Dep't of Revenue, 25 Wn. App. 2d 699, 709, 524 P.3d 1066 (2023), aff'd, 4 Wn.3d 142, 560 P.3d 839 (2024). We sit in the same position as the superior court, in direct review of the Board's decision. Id. The APA provides several bases to reverse the Board, including erroneous interpretation or application of the law, the order not being supported by substantial evidence, or the order being arbitrary and capricious. RCW 34.05.570(3). "We review issues of law de novo under the APA error of law standard, which allows us to substitute our view of the law for that of the Board." Envolve, 25 Wn. App at 710. The party challenging the Board's decision, here Superior, bears the burden of demonstrating the invalidity of the Board's decision. RCW 34.05.570(1)(a).

"Exemptions to a tax law must be narrowly construed. Taxation is the rule and exemption is the exception." Budget Rent-A-Car of Wash.-Or., Inc. v. Dep't of

5

Revenue, 81 Wn.2d 171, 174, 500 P.2d 764 (1972) (citations omitted).  Taxpayers bear the burden of proving they are factually exempt from a tax.  Lamtec Corp. v. Dep't of Revenue, 170 Wn.2d 838, 843, 246 P.3d 788 (2011).  "At trial, the burden shall rest upon the taxpayer to prove that the tax as paid by the taxpayer is incorrect."  RCW 82.32.180.

III

Superior argues that its use of goods and services to produce the containment system and modify the vessel is not subject to Washington's use tax because its contract with Shell is exempt as a lease of a new article of tangible personal property.  We disagree.  The definition of "lease," for purposes of the use tax exemption, excludes agreements where the contractor provides tangible personal property with an operator who is "necessary for the tangible personal property to perform as designed."  RCW 82.04.040(3)(b)(iii).  Because Superior provided extensive hiring, training, and operational expertise for the containment system and vessel, its services to Shell are not a "lease" exempt from the use tax.

A

Washington imposes a "tax or excise for the privilege of using within this state as a consumer" any article of tangible personal property.  RCW 82.12.020(1)(a).  Consumer means "any person who purchases, acquires, holds, or uses any article of tangible personal property irrespective of the nature of the person's business and including, among others, without limiting the scope hereof, persons who install, repair, clean, alter, improve, construct, or decorate real or personal property."  RCW 82.04.190(1).  But one is exempt and not considered a

6

"consumer" when "[c]onsuming such property in producing for sale as a new article of tangible personal property or a new substance, of which such property becomes an ingredient." RCW 82.04.190(1)(c). Under the statute, a "lease" is a "sale." RCW 82.04.040(1). " 'Lease or rental' means any transfer of possession or control of tangible personal property for a fixed or indeterminate term for consideration." RCW 82.04.040(3)(a). Superior argues it is not subject to the use tax because it was producing for lease a new article of tangible personal property—the containment system and the vessel.

However, RCW 82.04.040(3)(b) establishes certain exceptions for when something will not be considered a "lease." Here, the relevant exception is,

> [p]roviding tangible personal property along with an operator for a fixed or indeterminate period of time. A condition of this exclusion is that the operator is necessary for tangible personal property to perform as designed. For the purpose of this subsection (3)(b)(iii), an operator must do more than maintain, inspect, or set up the tangible personal property.

RCW 82.04.040(3)(b)(iii). This exception is consistent with other provisions of chapter 82.04 RCW, as the statute elsewhere provides one definition for "retail sale" or "sale at retail," as

> the charge made for providing tangible personal property along with an operator for a fixed or indeterminate period of time. A consideration of this is that the operator is necessary for the tangible personal property to perform as designed. For the purpose of this subsection (9), an operator must do more than maintain, inspect, or set up the tangible personal property.

RCW 82.04.050(9).

The Department has adopted an interpretive rule, WAC 458-20-211 (Rule 211) to "explain[] how persons are taxable who rent or lease tangible personal

7

property or rent equipment with an operator."[2] WAC 458-20-211(1). Rule 211 defines a "true lease" or "operating lease" as a lease of property for consideration "with the property under the dominion and control of the lessee for the term of the lease with the intent that the property will revert back to the lessor at the conclusion of the lease." WAC 458-20-211(2)(f). Rule 211 sets out a "true object test" to analyze a transaction "involving the rental of equipment with an operator, to determine if the lessee is simply purchasing the use of the equipment or purchasing the knowledge, skills, and expertise of the operator beyond those needed to operate the equipment." WAC 458-20-211(2)(e)(i).

Rule 211's examples 5 and 6 provide guidance on applying the true object test. WAC 458-20-211 (2)(e)(i). In example 5, "ZYX Construction Co. contracts with WVU Rental Co. for the rental of scaffolding. WVU's technicians set up, move, and dismantle the equipment. After assembly, ZYX assumes dominion and control over the use of the scaffolding until it is dismantled by WVU upon conclusion of the construction project." WAC 458-20-211(8). In this example, the business activity is classified as a rental of tangible personal property without an operator. Id. In example 6,

> ABC Crane Co. is hired by DEF Builders Co. to supply a crane and
> operator to lift air conditioning equipment from the ground and hold

---

[2]Citing Association of Washington Business v. Department of Revenue, Superior argues that Rule 211 is merely persuasive and not binding. 155 Wn.2d 430, 447, 120 P.3d 46 (2005) ("[Interpretive rules] serve merely as advance notice of the agency's position should a dispute arise and the matter result in litigation. The public cannot be penalized or sanctioned for breaking them. They are not binding on the courts and are afforded no deference other than the power of persuasion."). We ultimately resolve the question based on RCW 82.04.040(3)(b)(ii), not the Department's interpretive rule.

> it in place on the roof of a six-story building while DEF employees bolt the unit down. ABC's operator will retain control over the crane. ABC has no responsibility to attach wiring, plumbing, or otherwise make the unit operational.

Id. In this example, ABC's business activity is classified as a rental of equipment with an operator. Id. These two examples provide bookends for when a rental or lease is with or without an operator.

B

The Board found that the contract was structured as a lease, a finding not disputed by the parties. The parties disagree as to whether Shell exercised sufficient dominion and control over the containment system and the vessel for the contract to be a lease of tangible personal property. Because the true object of the contract was for Superior to provide Shell with the containment system and vessel, along with accompanying operators necessary to ensure they performed as designed, the contract is not considered a lease for the purposes of the use tax. See RCW 82.04.040(3)(b)(iii). Superior owes use tax as a consumer.

1

The opening of section IV of the contract, "scope of work," states that "[Superior's] scope of work is to manage, design, fabricate, procure, assemble, test, demonstrate, maintain *and operate* an arctic subsea spill containment system." (Emphasis added.) Superior's obligations included,

- *Recruiting and training operations staff*
- Commissioning and testing the system
- Demonstrating the system
- Maintaining the system ready for response in the Beaufort or Chukchi Sea during the drilling season.
- *Operating the system should it be required in an emergency*

- Participating in COMPANY readiness activities, including Incident Management Drills and stakeholder engagements
- De-commissioning, maintaining, and preserving the system in storage during the off-season.

(Emphasis added.)

Under "operations scope," Superior was required to

- *Prepare operating manuals*
- Prepare maintenance manuals
- Prepare commissioning plans
- Prepare subsea deployment plans
- *Develop a training simulator and training program for deployment and operation of the various systems*
- Arrange for personnel to receive other required training and certifications
- *Recruit and train operating staff each operating season*
- Commission all systems prior to each operating season
- Perform acceptance tests and deployments for regulators and stakeholders in Alaska
- *Train operators using the simulator, on-board equipment and other training materials*

. . . .

- De-commission and preserve equipment to protect it from corrosion and deterioration in the off season
- *In the event of a subsea well incident, call up [Superior personnel], move to the wellsite, and deploy equipment under the direction of [Shell].*

(Emphasis added.) Under the contract, Superior was obligated to ensure competency in its training systems, supply personnel, and "demonstrate that the requisite knowledge and training to manage [the containment system] onboard control systems [had] been achieved." In defining the terms used in the contract, "WORK" means that Superior was obligated to provide "*operation*, maintenance *and all other necessary services, personnel and labor not specifically listed*" in accordance with its obligations under the contract.

Under the contract, Superior had to "provide sufficient personnel at all times to ensure performance and completion" of the work, and all personnel employed "shall, for the work, which they are required to perform, be competent, properly qualified, skilled and experienced in accordance with good industry practice." The Board found that while the vessel was moored near Kotzebue, no one lived on the vessel, but Superior employees and contractors "did visit the vessel on a daily basis to ensure that the [containment system] equipment was functioning properly." In the event of an oil well blowout, Superior maintained a response team, composed of "employees and/or contractors," ready to be "flown in" and deployed to operate the containment system.

2

For Superior to be exempt from the use tax, the contract must have been a "lease" as defined by RCW 82.04.040(3). But the contract is excluded from the definition of a lease if Superior provided the containment system "with an operator for a fixed or indeterminate period of time," and "the operator [was] necessary for the [containment system] to perform as designed." RCW 82.04.040(3)(b)(iii). For this to apply, the operator "must do more than maintain, inspect, or set up the [containment system]." RCW 82.04.040(3)(b)(iii). To determine if the contract was for use of tangible personal property with an operator, the Department advises application of the "true object test" to determine if Shell was "simply purchasing the use of the [containment system] or purchasing the knowledge, skills, and expertise of the operator beyond those needed to operate the equipment." WAC 458-20-211(2)(e)(i).

The contract includes numerous provisions requiring Superior to recruit and train qualified personnel. It required Superior to develop a training program and training simulator for the "operation of various systems." The contract contains provisions requiring Superior to operate the containment system. During the 2015 drilling season, Superior personnel and contractors visited the vessel daily to ensure the containment system's readiness. Superior maintained a response team offsite that was ready to fly into Alaska and deploy the containment system in the event of an oil well blowout. These responsibilities go beyond maintaining, inspecting, or setting up the system.

Superior argues that the services it provided are analogous to Rule 211's example 5, the scaffolding example described above, an example of rental or lease of tangible personal property without an operator. WAC 458-20-211(8). But Superior's obligations are more akin to example 6, a rental or lease with an operator, where a company contracts for use of a crane and an operator for the crane. WAC 458-20-211(8). In the event of an oil well blowout, Superior would have moved the containment system into place while providing the necessary expertise for its operation. Considering the expertise and services that Superior contracted to provide Shell, the true object of the contract was not just for Superior to provide the containment system to Shell, it was for Superior to provide the containment system with an operator.

Though there was no oil well blowout in the 2015 drilling season, and the containment system was not deployed outside of testing, Shell contracted with Superior for its expertise to operate the containment system if such a blowout

12

occurred. Superior designed and built the containment system, and its operators were "necessary for the [containment system] to perform as designed." RCW 82.04.040(3)(b)(iii). Therefore, the contract is excluded from the definition of a "lease" for purposes of the use tax and Superior is subject to the use tax under RCW 82.12.020(1)(a).

IV

Superior argues in the alternative that its services to Shell are exempt from the use tax under RCW 82.12.0254(1)(b) because the vessel was "a tax-exempt watercraft used primarily in interstate and foreign transportation of property for hire." The Department counters that Superior does not qualify for the exemption because the vessel is not a "watercraft," and even if it is a "watercraft," it was only used to provide services to Shell, not transport property, and that the only property transported were components of the containment system. We do not decide whether the vessel is a "watercraft" because regardless, it was not used *primarily* to transport property in interstate commerce.

There is a use tax exemption for any "watercraft used *primarily* in conducting interstate or foreign commerce by transporting property or persons for hire." RCW 82.12.0254(1)(b) (emphasis added). The exemption also applies to "[tangible] personal property that becomes a component part of any such . . . watercraft in the course of repairing, cleaning, altering, or improving the same," and "[l]abor and services rendered in respect to such repairing, cleaning, altering, or improving." RCW 82.12.0254(1)(c)-(d). In the common carrier context, WAC 458-20-175 defines "component part" as tangible personal property "which is

13

attached to and a part of carrier property. It also includes spare parts which are designed for ultimate attachment to carrier property. The said term does not include furnishings of any kind which are not attached to the carrier property nor does it include consumable supplies."

Superior claims it is exempt from the use tax because the vessel carried the containment system and property owned by Shell in interstate and foreign commerce, and the vessel was "modified specifically to transport the [c]ontainment [s]ystem, along with other equipment for Shell for hire in interstate and foreign commerce."

Superior moved the vessel to Bellingham in April 2012. Superior made extensive modifications to the vessel and constructed the containment system. The vessel housed the containment system in two modules, a subsea module and a process module carried on the deck. The vessel carried some components owned by Shell, including a choke manifold, hoses, umbilical, and a chemical injection system. The major components of the containment system "were welded to the deck" of the vessel and connected to the containment system's "electrical, plumbing, and control systems." Except for one trip to Vancouver, Canada, for modifications in 2015, the vessel remained docked in Washington until June 2015, and while docked, Superior only carried out maintenance activities. While in transit, the vessel carried no crew. While the vessel was docked in Kotzebue during the 2015 drilling season, no one lived aboard.

When the vessel was deployed to Alaska for the 2015 drilling season, Shell paid Superior a "Pre-Season Transit Fee" of $3,090,500.00 and a "Post-Season

14

Transit Fee" of $3,752,750.00 at the conclusion of the season. In contrast, Shell paid Superior over $89 million to modify the vessel, and over $86 million to produce the containment system. Shell paid Superior non-drilling rates, to maintain the containment system and vessel, in 2013, totaling $28,674,000.00, and in 2014, totaling $35,842,500.00. After the 2015 drilling season, when Shell terminated the contract, Shell paid Superior a demobilization fee of $2,875,000.00 and contract termination fee of $24,931,000.00.

We are not persuaded by Superior's argument that it is exempt from the use tax under RCW 82.12.0254(1)(b). The vessel's primary purpose was not to "transport property for hire." Superior received less than $7 million for its transit fees related to the 2015 drilling season, while it received over $175 million for modification and production of the containment system and vessel, and $60 million in fees for maintaining the two in 2013 and 2014. The contract described Superior's scope of work as, "manage, design, fabricate, procure, assemble, test, demonstrate, maintain, and operate an arctic subsea spill containment system" that "meets the design and performance requirements specified." The vessel's primary use was to carry the containment system to a drilling site to be available in case of an oil well blowout, deploy the containment system, and act as a support vessel. This is different from transporting property or persons in interstate commerce for the sake of transporting them from one place to another.

In the absence of evidence that the vessel took on transport of property or persons other than its own operational equipment it cannot be described as being

15

"used primarily" for transport.  See Budget Rent-A-Car, 81 Wn.2d at 174 ("Exemptions to a tax law must be narrowly construed.").

We affirm the Board's decision and reverse the superior court's decision.

_Birk, J._

WE CONCUR:

_Bui, J._                    _Mann, J._